**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **DZ JEWELRY LLC d/b/a ZADOK JEWELERS,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **CIVIL ACTION NO. _____** |
| **CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. SS0140418/7266,** | § § § § | |
| **Defendant.** | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff DZ Jewelry LLC d/b/a Zadok Jewelers ("Zadok") files this Original Complaint against Defendant Certain Underwriters at Lloyd's, London Subscribing to Policy No. SS0140418/7266 ("Lloyd's of London") and, in support of its causes of action, would respectfully show the Court the following:

## I.   NATURE OF ACTION

1.   This is an original complaint for breach of contract and declaratory and injunctive relief arising from Lloyd's of London's refusal to pay COVID-19 related claims as required by its insurance policies it sold to Zadok.

2.   Zadok owns and operates a retail jewelry store located at 1749 Post Oak Blvd., Houston, Texas 77056.  This jewelry store is located in the Uptown commercial and residential district in Houston, which is home to many luxury and high-end retailers of jewelry, watches, clothing, and automobiles, and which is internationally renowned and attracts affluent buyers from around the world.

3.      As a result of various orders issued by the State of Texas and Harris County relating to COVID-19, and due to the prevalence of COVID-19 itself, Zadok was required to close its store completely from March 23, 2020 through April 30, 2020, and only permitted to open its store with a reduced capacity from May 1, 2020 through to the present. As a result of this extended closure and subsequent reopening under significantly reduced capacity, Zadok has experienced approximately $2 million in lost sales.

4.      Zadok purchased an all-risk commercial property insurance policy from Lloyd's of London to indemnify it for business income lost due to the shutdown of its operations. Zadok paid thousands in annual premiums for the policy for coverage under the policy, with 30 days of business income loss coverage, two weeks of civil authority coverage, and related extra expense coverage.

5.      Yet, despite Zadok's claim for payment under the policy to cover these losses to its income, Lloyd's of London has refused to provide the protection that Zadok purchased, citing policy exclusions and coverage defenses that do not apply and which have no merit.

6.      On March 11, 2020, the World Health Organization (WHO) issued an announcement declaring that COVID-19 had become a pandemic. On March 16, 2020, the United States issued new guidelines urging avoidance of gatherings of more than ten people, and states, counties and cities across the nation began announcing widespread business shutdown and stay-at-home orders, including orders issued by the State of Texas and Harris County, where Zadok's store is located. As of the date of filing of this complaint, more than 5.5 million people were confirmed to have been infected with COVID-19 in the United States, with over 173,000 deaths reported nationwide, according to the United States Centers for Disease Control and Prevention ("CDC").

7.      COVID-19 is caused by a novel coronavirus now known as Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2). It is a physical virus that is spread and transmitted through the air and contact with surfaces of property. While the virus reportedly originated in China, the rapid transmission of COVID-19 has resulted in the United States alone in an exponential increase in the number of cases to about forty times the number of reported cases and thirty times the number of reported deaths in mainland China. For the purposes of this complaint, Zadok refers to both the virus and the resulting diseases as COVID-19.

8.      The virus easily disseminates among humans through respiratory droplets, which are produced by coughing, sneezing and talking, and through aerosols, which are released during breathing. It can also spread through contact with an object or surface containing the virus. Infected aerosols can remain suspended for hours in the air and for days on objects and surfaces, potentially infecting someone who unwittingly touches an infected object or surface and then touches his or her face.

9.      As of April 1, 2020, the United States and every state in the Union had issued emergency declarations relating to COVID-19, and by mid-April 95% of the population of the United States was under one or more state or local directives to, among other things, refrain from close contact with other persons. While some of these orders and declarations were lifted, the re-acceleration of COVID-19 cases in late spring and early summer has led 22 states to pause or reverse their reopening processes as of July 22, 2020.

10.     The closure orders typically ordered the shutdown of businesses deemed "non-essential" and prohibited in-person services to be provided on their premises. Businesses deemed "essential" have also been heavily impacted by the closure orders. For example, businesses deemed to be essential have had to cease in-person services (such as dining in a restaurant), adjust cleaning

protocols, limit hours, install barriers between employees and customers, and supply employees with personal protective equipment. Many of these businesses have been unable to keep employees at work on their premises because of their fear of becoming infected.

11.     During the pandemic, Governor Greg Abbott of the State of Texas has issued various business shut down and closure orders. Similar orders have also been issued by County Judge Lina Hidalgo of Harris County. Additionally, both the State of Texas and Harris County have issued emergency orders related to the COVID-19 pandemic. Together, these Closure Orders have caused the suspension of operations by both non-essential and essential businesses, including the complete shutdown of Zadok's retail jewelry store.

12.     The first case of COVID-19 in Texas was reportedly confirmed on March 4, 2020, in Fort Bend County—a county contiguous with Harris County and within close proximity to Zadok's store. The first case in Harris County, Texas was confirmed on March 5, 2020. Harris County remained open for business for approximately nineteen (19) days after the first cases were reported. Given that it takes up to fourteen days to develop symptoms after infection, people infected by the virus, or who had contact with other infected people, have likely visited Zadok's store, and thereby contaminated Zadok's store and surrounding property with the virus by the time of the Closure Orders, and thereafter. By March 20, 2020, there was a known risk that surfaces of physical property located in businesses nationwide were potentially infected, and that risk, among others, prompted the Closure Orders, as acknowledged in those orders.

13.     The transmission of COVID-19 and the Closure Orders have adversely impacted Zadok's business. For example, customers could not access Zadok's place of business due to the Closure Orders or the fear of being infected with COVID-19. Suppliers to businesses have also

been adversely impacted by the Closure Orders and COVID-19. And, three Zadok employees have tested positive for COVID-19 since the pandemic began.

14.     But Zadok, like other businesses, prudently prepared for an unexpected event like the COVID-19 pandemic. Specifically, Zadok purchased insurance from Lloyd's of London, under Policy No. SS0140418/7266 (the "Policy"), that did not exclude coverage for income loss caused by a virus.

15.     The Policy protected Zadok from business income losses at its store located at 1749 Post Oak Blvd., Houston, Texas 77056 ("Insured Premises").

16.     The Insured Premises generates an average of $40 million in sales annually.

17.     The Policy provides coverage for:

   a.   Business income losses sustained due to the necessary suspension of operations ("Business Income" coverage)

   b.   Expenses incurred to minimize the suspension of business and to continue operations after a suspension of business ("Extra Expense" coverage)

   c.   Interruption of business caused by an order from a civil authority ("Civil Authority" coverage)

18.     In addition, the Policy requires that Zadok take all reasonable steps to protect the Insured Premises from damage. In this situation, this required Zadok to suspend operations to reduce the risks of infection by COVID-19 and the contamination of the Insured Premises and further injury that would be occasioned by the spread of COVID-19 at Zadok's store. Had Zadok *not* suspended operations, it would have been in breach of its duties under the Policy.

19.     On or about April 3, 2020, Zadok initiated a claim with Lloyd's of London for interruption of business, loss of business income, and extra expenses as a result of COVID-19.

20.     On May 28, 2020, Lloyd's of London issued a denial letter to Zadok regarding this claim. This denial letter does not detail or otherwise show findings from any investigation, but rather consists almost entirely of Lloyd's of London's self-serving interpretations of its own policy language.

21.     Lloyd's of London has caused substantial harm to Zadok by wrongfully refusing coverage under the Policy.

22.     Zadok seeks to recover damages for breach of contract, as well as declaratory and injunctive relief.

## II.     PARTIES

23.     Zadok is a limited liability company which is a resident of the State of Texas and transacts business in Harris County, Texas. Zadok operates a retail jewelry store located at 1749 Post Oak Blvd., Houston, Texas 77056.

24.     Lloyd's of London is an insurance company doing business in the State of Texas. It can be served by serving its registered agent for service of process, Mendes & Mount (N.Y.), via certified mail, at 750 7th Avenue, New York, New York 10019-6829.

## III.     JURRISDICTION AND VENUE

25.     This court has jurisdiction over this action under 28 U.S.C. § 1332 because there is and was complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

26.     Venue is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred within the jurisdictional boundaries of this district and division. In particular, the insurance policy in effect covered the Zadok store located in this

division, and the event giving rise to the coverage dispute pertained in part to orders emanating from the leadership of Harris County, Texas, which is located within this division.

## IV.    FACTUAL BACKGROUND

### A.  The Physical Transmission of the Virus Through Air and Surfaces

27.    According to the CDC, COVID-19 can spread by respiratory droplets when an infected person talks, sneezes, or coughs, and can also be spread through contact with surfaces touched or breathed on by an infected person.  According to several studies, the virus can live on surfaces for several days.

28.    Coronaviruses are not new. The name comes from the crown-like appearance of the array of spikes around the enveloped virion.  Coronaviruses are responsible for approximately 25% of human colds of all age groups. The SARS-CoV-2 disease that spread from southern China in 2002 is a coronavirus. Prior studies have shown that coronaviruses have been detected on surfaces of physical objects located in a wide array of public spaces and businesses, including hospitals, daycare centers, offices, and restaurants. Studies found that SARS-CoVs have retained their infectivity for up to nine days on surfaces. And studies have shown that coronaviruses can live for up to eight days on produce, such as lettuce, and can be recovered from lettuce with an efficiency of 19.6%.

29.    In an article posted on the National Institute of Health's website on March 24, 2020, the NIH stated that "[v]iruses can live for a time on surfaces outside the human body. According to the CDC, it may be possible to contract the virus responsible for the current outbreak, SARS-CoV-2, by touching a surface or object with the virus on it and then touching your face."

30.    When frozen, viruses can survive up to two years and can travel across the globe

undetected. In August 2020, Chinese authorities found samples of COVID-19 on the surface of frozen chicken wings imported from Brazil and the outer packaging of frozen shrimp imported from Ecuador. Likewise, New Zealand authorities are investigating whether the recent COVID-19 outbreak in Auckland—which ended the country's 102-day streak without any community transmission of COVID-19—stemmed from the surface of imported frozen food containers due to multiple of the first cases being traced to workers at a frozen food warehouse.

31.     In addition, studies have reported that COVID-19 has been detected in the air. The NIH article reported that a study published in the *New England Journal of Medicine* found that aerosols containing the virus remained highly infectious in the air for at least 3 hours.  In that study, published on March 17, 2020, Researchers led by Dr. Vincent Munster of NIH's National Institute of Allergy and Infectious Diseases studied how long the virus survives in the air and on surfaces. The researchers reported that the COVID-19 virus remained infectious on plastic and stainless-steel surfaces for two to three days, and it remained infectious for up to 24 hours on cardboard surfaces. The study found that "Aerosols from infected persons may therefore pose an inhalation threat even at considerable distances and in enclosed spaces…." The NIH, reporting on the study, stated that the "results suggest that people may acquire SARS-CoV-2 through the air and after touching contaminated objects."

32.     These air and surface transmissions are made possible in part because COVID-19 transmits through aerosols.  The American Association for the Advance of Science's prestigious magazine *Science* recently published an article by Dr. Kimberly Prather, who found that COVID-19 transmits through aerosols—which are produced by normal breathing—and through surfaces on which the aerosol particles land. She reported

Respiratory infections occur through the transmission of virus-containing droplets (>5 to 10 μm) and aerosols (≤5 μm) exhaled from infected individuals during breathing, speaking, coughing, and sneezing. Traditional respiratory disease control measures are designed to reduce transmission by droplets produced in the sneezes and coughs of infected individuals. However, a large proportion of the spread of coronavirus disease 2019 (COVID-19) appears to be occurring through airborne transmission of aerosols produced by asymptomatic individuals during breathing and speaking (1–3). Aerosols can accumulate, remain infectious in indoor air for hours, and be easily inhaled deep into the lungs. [1]

33.     Dr. Prather also found that because it transmits as an aerosol, COVID-19 can physically contaminate surfaces and be transmitted through contact with those infected surfaces.

Respiratory droplets will undergo gravitational settling faster than they evaporate, contaminating surfaces and leading to contact transmission. Smaller aerosols (≤5 μm) will evaporate faster than they can settle, are buoyant, and thus can be affected by air currents, which can transport them over longer distances. Thus, there are two major respiratory virus transmission pathways: contact (direct or indirect between people and with contaminated surfaces) and airborne inhalation.[2]

34.     The World Health Organization corroborated Dr. Prather's research, finding that COVID-19 had at least eight different confirmed modes of transmission, including contact, droplet, airborne, and fomite (i.e., infected surfaces). When droplets expelled by infected individuals land on and contaminate a surface, the surface becomes a viable transmitter of COVID-19 "for periods ranging from hours to days, depending on the ambient environment (including temperature and humidity) and the type of surface."[3]

35.     In an interview with *America* magazine on May 26, Dr. Anthony Fauci, who leads the National Institute of Allergy and Infectious Diseases, referenced aerosol transmission in churches. "When you sing, the amount of droplets and aerosol that come out is really, in some

---

[1] https://science.sciencemag.org/content/early/2020/05/27/science.abc6197.
[2] *Id.*
[3] https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions

respects, scary," Dr. Fauci said.[4]

36.      Similarly, another scientist, Dr. Lidia Morawska, told *Nature* that, "In the minds of scientists working on this, there's absolutely no doubt that the virus spreads in the air. This is a no-brainer."[5]

37.      The World Health Organization, in its guidance on wearing masks, recognized that COVID-19 can transmit person-to-person "directly by contact with infected people, or indirectly by contact with surfaces in the immediate environment or with objects used on or by the infected person," with the primary mode of transmission "via respiratory droplets and contact routes."[6]

38.      Other studies have shown that in addition to water droplets, COVID-19 is transmitted through aerosols. A study of hospitals in Wuhan, China, found COVID-19 in aerosols further than 6 feet, and up to 13 feet, from patients with higher concentrations detected in more crowded areas.[7] Those authors found evidence of the virus on floors, trash bins, air vents, and other places. Estimates using an average viral load for COVID-19 indicate that one minute of loud speaking could generate more than 1000 virion-containing aerosols.[8]

39.      Other studies have used invisible fluorescent tracers—decoy germs that glow under black light—to track how germs are spread from surfaces. In one series of experiments, 86 percent of workers were contaminated when spray or powder tracers were put on commonly touched objects in an office. When tracer powder was put on a bathroom faucet and exit doorknob, the

---

[4] https://www.americamagazine.org/faith/2020/05/27/dr-anthony-fauci-catholic-churches-masks-communion-covid-coronavirus.
[5] https://www.nature.com/articles/d41586-020-00974-w.
[6] World Health Organization, Advice on the Use of Masks in the Context of COVID-19, at 1-2 (June 5, 2020).
[7] Y. Liu et al., Nature (2020). doi:10.1038/s41586-020-2271-3pmid:32340022.
[8] V. Stadnytskyi, C. E. Bax, A. Bax, P. Anfinrud, Proc. Natl. Acad. Sci. U.S.A. 202006874 (2020). doi:10.1073/pnas.2006874117pmid:32404416.

glowing residue was found on employees' hands, faces, phones and hair. From a shared cell phone, the tracer spread to desktop surfaces, drinking cups, keyboards, pens and doorknobs. A contaminated copy machine button added a trail of fluorescent finger prints transferred to documents and computer equipment. And just twenty minutes after arriving home from the office, the decoy germs carried by the employee were found on backpacks, keys and purses, and on home doorknobs, light switches, countertops and kitchen appliances.[9]

40.     A recent study of an outbreak from a restaurant in China concluded that the transmission in that case was likely prompted by air-conditioned ventilation.[10]  In that case, from January 26 through February 10, 2020, an outbreak of COVD-19 infected ten persons from three families (families A–C) who had eaten at the same air-conditioned restaurant in Guangzhou, China. The only known source of exposure for the affected persons in families B and C was patient A1 at the restaurant. The families were seated more than a meter apart, and yet 10 people became ill who were at the restaurant that day. The authors concluded that the virus likely spread through the restaurant's air-conditioning system.

41.     A 2014 analysis published in the scientific journal *Clinical Infectious Diseases* investigated an outbreak of a SARS-CoV virus in an apartment complex where the residents were not in close contact.[11] The study found that "airborne spread was the most likely explanation, and the SARS coronavirus could have spread over a distance of 200 meters," or about 600 feet.[12]

---

[9] Kelly A Reynolds, Pamela M Watt, Stephanie A Boone & Charles P Gerba (2005) Occurrence of bacteria and biochemical markers on public surfaces, International Journal of Environmental Health Research, 15:3, 225-234, DOI: 10.1080/09603120500115298.

[10] Lu J, Gu J, Li K, Xu C, Su W, Lai Z, et al. COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020. Emerg Infect Dis. 2020 Jul [date cited]. https://doi.org/10.3201/eid2607.200764.

[11] https://academic.oup.com/cid/article/58/5/683/365793.

[12] *Id.*

42.     The fact that COVID-19 can spread through the aerosols, on surfaces, and through the air has made the ease of transmission of the virus especially alarming. It means the virus can spread to people who are not close to each other, who occupy the same space at different points in time, or who merely breath the same air or touch common surfaces at different periods of time.

43.     COVID-19 therefore has and continues to pose a direct threat of physical loss or physical damage to property. Moreover, has and continues to render property unsafe.

**B.  The COVID-19 Closure Orders**

44.     State and local governments across the United States have determined that, in light of these dangers of physical transmission and the physical presence of the virus in affected businesses, closure orders were required to slow the spread of COVID-19.

45.     On March 11, 2020, the WHO declared COVID-19 a global pandemic. And President Trump announced he would block travelers from continental Europe. On March 12, 2020, an influential scientific study posted on the CDC's website found that surface transmission of the virus was the most likely explanation for an outbreak at a Chinese shopping mall.[13] In that study, the researchers studied an outbreak in January, when seven workers who shared an office in a shopping mall became ill after one of their co-workers returned from Wuhan. Public health officials tracked two dozen more sick people, including several women who had shopped at the mall, as well as their friends. None of them had come into contact with the sick office workers. The researchers concluded that "its findings appear to indicate that low intensity transmission occurred without prolonged close contact in this mall; that is, the virus was spread by indirect transmission." One leading explanation was that the virus was "spread via fomites" (i.e., infected surfaces), such as "elevator buttons or restroom taps." Virus aerosolization was also suspected.

---

[13] https://www.nc.cdc.gov/eid/article/26/6/20-0412_article.

12

46.     On March 15, 2020, the CDC issued guidance restricting gatherings to less than 50 people. In the guidance, the CDC recognized the danger of spreading the virus through surface transmission, and through the air, advising people to "clean frequently touched surfaces and objects daily," to cover "coughs and sneezes," and to "routinely clean and disinfect surfaces and objects that are frequently touched."

47.     A number of orders issued by the State of Texas and Harris County (collectively, the "Closure Orders") have directly impacted the operations of Zadok's jewelry store.

48.     On March 13, 2020, Texas Governor Greg Abbott declared a state of disaster due to the spread of COVID-19 in Texas. A few days later, on March 17, 2020, Governor Abbott requested that the Small Business Administration declare an Economic Injury Disaster Declaration for the state; that request was granted on March 20, 2020.

49.     On March 19, 2020, Governor Abbott issues several executive orders relating to COVID-19, including:

- Banning gatherings of more than 10 people;

- Discouraging individuals from going to bars, food courts, restaurants, and gyms;

- Limiting visitations to retirement homes and long-term care facilities; and

- Temporarily closing all Texas schools.

50.     On March 23, 2020, Governor Abbott requests that President Donald J. Trump issue a disaster declaration for the State of Texas; this declaration was made on March 25, 2020.

51.     Harris County Judge Lina Hidalgo issued a "Stay Home, Work Safe" Order on March 24, 2020 which prohibited gatherings and limited activity to performing essential services.

52.     This Harris County Order had been extended by Judge Hidalgo up through June 11, 2020. On that date, Harris County devised a color-coded system to apprise residents of the danger

level pertaining to the risk of contracting COVID-19. As of August 20, 2020, Harris County is currently at the highest and most dangerous level, Level 1: Stay Home, Work Safe.[14]

53.     On March 31, 2020, Governor Abbott issued an additional order amending social distancing guidelines and enacting further limitations on activities which may contribute to the spread of COVID-19.

54.     As of April 3, 2020, the Houston metropolitan area (including Harris County) accounted for 38 percent of COVID-19 cases in the State of Texas.[15]

55.     On April 11, 2020, Governor Abbott extended the disaster declaration for an additional 30 days. This declaration would be extended yet again on May 12, 2020.

56.     On April 27, 2020, Governor Greg Abbott issued Executive Order GA-18 which still mandated that social gatherings be minimized and in person contact be limited, but allowed for the reopening of retail establishments, including Zadok's retail jewelry store, on May 1, 2020 at 25% capacity.

57.     On May 5, 2020, and again on May 18, 2020, Governor Abbott amended the Texas Order to allow for expanded retail openings up to 50% capacity.

58.     On June 26, 2020, Governor Abbott further supplemented the Texas Order to impose new restrictions on retail and restaurant establishments in light of an increasing number of COVID-19 cases in the state.

59.     As of April 1, 2020, at least forty-four states and local governments across the country had issued orders entirely closing restaurants for in-person dining; at least five more

---

[14] HARRIS COUNTY, TEX., HARRIS COUNTY COVID-19 THREAT LEVEL SYSTEM, https://www.readyharris.org/Stay-Safe (last visited August 20, 2020).
[15] Kamath, Tulsi (April 3, 2020). "At 2,029, Houston-area coronavirus cases account for 38% of all cases in Texas". Click2Houston.com. Houston, Texas. Archived from the original on April 7, 2020. Retrieved July 7, 2020.

allowed only limited on-site service; and one limited gatherings to no more than ten people.[16] By April 15, 2020, at least forty-three states had issued orders closing or severely limiting the operation of non-essential businesses, and at least forty-seven states had issued orders prohibiting restaurants from offering dine-in services, with other states either limiting on-site service or prohibiting gatherings of more than ten people.[17] The purpose of these orders was to try to mitigate and slow the spread of COVID-19.

60.     Every state has issued emergency declarations to slow the spread of COVID-19, with many states reenacting or re-extending emergency declarations in June or July 2020 as COVID-19 cases accelerated in much of the country. Twenty-two states paused or reversed their reopening process, with a further eleven states still partially closed.[18] Moreover, even in places that have reopened, businesses remain constantly threatened with further closures due to COVID-19 contamination brought in by infected customers or employees.

61.     The situation in a given location can and does change rapidly, as evidenced both by the states that have reversed reopening, as well as by other countries, such as Australia, Croatia, and Israel, that after having COVID-19 under control saw a second wave in July 2020 that exceeded the first wave in March and April 2020.

62.     Closure orders from around the country also explicitly acknowledge that COVID-19 can spread in and damage physical property, including surfaces. For example, a March 17, 2020 New York City order explicitly noted that "the virus physically is causing property loss and damage." Moreover, these closure orders, as well as federal government guidance, specifically

---

[16] https://web.archive.org/web/20200401202749/https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/.

[17] https://web.archive.org/web/20200415130206/https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/.

[18] https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html

recognize that COVID-19 endangers property, and can be physically spread by touching infected surfaces and through the air

63.     The global pandemic relating to the COVID-19 has had a tremendous impact throughout the world, leading to more than 205,000 deaths in the United States alone to date.[19]

64.     The COVID-19 pandemic has had a devastating effect on the United States, leading to the involuntary shutdown of many businesses across the country, including Zadok's store. Some estimates have suggested that several hundred thousand of the small businesses in the United States have shut down permanently due to COVID-19.

65.     As a result of the Closure Orders, Zadok closed its store from March 23, 2020 until April 30, 2020. The closure of its store due to COVID-19 resulted in a substantial loss of sales. Zadok estimates that forced closure of the Insured Premises resulted in a loss of sales in excess of $3 million.

66.     Individuals who have tested positive have also been confirmed to have been present at Zadok's store, as three Zadok employees have tested positive since the pandemic began.

67.     Although Zadok has since reopened its store, the capacity at the store at any given time is limited. And, there remains an ongoing and real threat that it will become subject to a new Closure Order, or have to temporarily shut down due to contamination from COVID-19.

### C. Zadok's Business Interruption Policy with Lloyd's of London

68.     In order to protect itself against unexpected risks like COVID-19, Zadok purchased

---

[19] CENTERS FOR DISEASE CONTROL AND PREVENTION, CORONAVIRUS DISEASE 2019 (COVID-19), http://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited October 2, 2020).

a commercial insurance policy from Lloyd's of London.

69.     Zadok and Lloyd's of London entered into a contract of indemnity, whereby Zadok agreed to make payments to Lloyd's of London in exchange for Lloyds of London's promise to indemnify Zadok for losses including, but not limited to, business income losses due to business interruption at its jewelry store located at 1749 Post Oak Blvd., Houston, Texas 77056.

70.     The Insured Premises collectively generates around $3 million USD in sales on a monthly basis.

71.     The Insured Premises is covered under a policy issued by Lloyd's of London with Certificate Number SS0140418/7266.

72.     The Policy was in full effect during the relevant time period, providing property, business personal property, business income and extra expense, and ordinance or law coverage.

73.     Zadok faithfully paid policy premiums to Lloyd's of London to specifically provide all risk coverage, including the extension of coverage in the event of the business's closure by order of civil authority.

74.     Based on information or belief, Lloyd's of London has accepted the policy premiums with no intention of providing any coverage due to direct physical loss and/or from a civil authority shutdown due to a global pandemic virus.

75.     The closure of its retail jewelry stores due to COVID-19 resulted in a substantial loss of sales. Zadok estimates that forced closure of the Insured Premises beginning on March 23, 2020 resulted in a loss of sales in excess of $3 million.

76.     Generally, under business interruption policies like the one issued to Zadok by

Lloyd's of London, the policies provide coverage for all risks to property, unless specifically excluded.

77.     The Policy does not provide any exclusion due to losses, business or property, from viruses or communicable diseases like COVID-19 in these circumstances. Nor does the Policy contain a pandemic exclusion clause.

78.     The risk of a virus like COVID-19 was foreseen, and foreseeable to, Lloyd's of London. The Insurance Services Office ("ISO"), an organization that provides policy writing services to insurers, sent the following statement to state insurance regulators in 2006, in connection with the submission of an exclusion of loss "due to disease-causing agents such as viruses and bacteria":

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

79.     Zadok's Policy contains no such applicable virus exclusion, despite its availability since 2006. Nor does Zadok's Policy contain an exclusion for "pandemics," "communicable disease," or anything similar.

80.     Moreover, to mitigate further losses, as required by the Policy, Zadok suspended operations while the Closure Orders and government officials announced that COVID-19 posed a risk of causing further physical property damage and loss.

81.     The Policy is composed of several distinct forms. Policyholders can pay for optional

forms and coverages, but the forms themselves are standardized.

82.     The Policy contains several types of additional coverages that provide coverage in these circumstances.

83.     The following coverages appear in the "BUSINESS INCOME COVERAGE AND SPECIAL FORM (AND EXTRA EXPENSE)" addendum which is a standardized form with form number "CP 00 30 10 91."

84.     Lloyd's of London agreed to provide coverage from an interruption to business caused by an action, such as an order, from a **"Civil Authority."** Specifically, Lloyd's of London agreed to pay for loss of business income and extra expenses "caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss."

85.     The term "Covered Causes of Loss" is defined to mean risks of direct physical loss unless the loss is excluded or limited by the policy. The Closure Orders directly resulted from direct physical loss caused by COVID-19, and the dangerous physical conditions resulting from the continuation of the direct loss, and have caused Zadok to have lost the use of its premises for their intended purpose, and no exclusion applies to these losses. Zadok's losses are covered under the Policy, including under the "Civil Authority" coverage. Access has been restricted to the Covered Property, and immediate surrounding area, due to the presence and threat of COVID-19 in the immediate surrounding areas and related Closure Orders. Zadok has suffered approximately $3 million per month in lost "Business Income" because it suspended operations of its business due to COVID-19 and the Closure Orders.

86.     Lloyd's of London is also obligated to pay for actual loss of **"Business Income"**

sustained "due to the necessary suspension of your 'operations' during the 'period of restoration.'" "Business Income" means "[n]et income (Net Profit or Loss before income taxes) that would have been earned or incurred" as well as "[c]ontinuing normal operating expenses incurred, including payroll." Zadok has suffered approximately $3 million per month in lost Business Income because of the necessary suspension of operations of its business due to the Closure Orders and COVID-19.

87.     Lloyd's of London also agreed to pay for **"Extra Expense."** Extra Expenses are "necessary expenses [the policyholder] incur[s] during the 'period of restoration' that [the policyholder] would not have incurred" absent the loss, including to repair or replace property. Zadok suspended operations due to COVID-19 and the Closure Orders and has spent money to break-down and clean the property for COVID-19 in order to minimize the suspension of business. Likewise, after Zadok was permitted to resume business and end the suspension, Zadok has suffered "Extra Expenses" to restore the property and prevent further damage to the property from the ongoing COVID-19 pandemic.

88.     The Policy exclusions which pertain to "pollutants" are inapplicable to a virus or global pandemic. By its terms, this exclusion applies to industrial-type pollutants, not viruses, and it does not once mention "viruses" or pandemics at all

89.     Zadok initiated a claim with Lloyd's of London for interruption of business, loss of business income, and extra expenses as a result of COVID-19 on or about April 3, 2020.

90.     On May 28, 2020, Lloyd's of London issued a denial letter to Zadok regarding its claim. This denial letter does not detail or otherwise show findings from any investigation, but rather consists almost entirely of Lloyd's of London's self-serving interpretations of its own policy

language.

91.    The denial letter issued by Lloyd's of London gives the following reasons for denying

the claim:

- Zadok did not claim a covered loss to the insured property;

- The Seepage and Pollution Exclusion applied to the claim, as the Orders issued by Judge Hidalgo concerned the threat of COVID-19, "which endangers the health, safety and welfare of persons";

- The Business Income provision did not apply, as there was no "claim for direct physical loss or damage to property at the premises";

- Extra Expense coverage did not apply as there was no physical loss or damage; and

- The Civil Authority coverage did not apply, as the action of the civil authority did not restrict access to the premises

92.    Zadok files this complaint to pursue various causes of action including breach of

contract, bad faith, and violation of the Texas Prompt Payment of Claims Act ("TPPCA") against

Lloyd's of London, relating to its handling of the claim in question and the wrongful denial of

Zadok's claim.

## V.    CAUSES OF ACTION

**A.    Breach of Contract – Business Income**

93.    Zadok incorporates by reference the preceding paragraphs as if fully alleged herein.

94.    Under Texas law, essential elements of a breach of contract claim are: (1) existence

of a valid contract; (2) performance or tendered performance by plaintiff; (3) breach of the contract

by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Toney v.*
*State Farm Lloyds*, 108 F. Supp. 3d 475, 480 (S.D. Tex. 2014).

95.    Zadok purchased a property coverage policy from Lloyd's of London.

96.     Zadok had substantially performed its obligations under the Policy including by paying all policy premiums due on the Policy and by giving sufficient notice of the claim to Lloyd's of London. Alternatively, Lloyd's of London has waived any conditions, terms or defenses to coverage.

97.     The Policy is an enforceable contract between Lloyd's of London and Zadok. The Policy was in effect as of the date that Zadok's retail jewelry store was required to close due to the Closure Orders.

98.     Zadok has sustained a loss under the Business Income coverage in the Policy due to the COVID-19 virus and Closure Orders.

99.     Lloyd's of London breached the terms of that contract by wrongfully denying the claim for Business Income coverage. Lloyd's of London wrongfully denied the claim by misrepresenting to Zadok the policy provisions and exclusions pertaining to the loss alleged.

100.     As a direct and proximate result of Lloyd's of London's breach of contract, Zadok has sustained substantial monetary damages in an amount to be determined at trial.

**B.      Declaratory and Injunctive Relief – Business Income**

101.     Zadok incorporates by reference the preceding paragraphs as if fully alleged herein.

102.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

103.     An actual controversy has arisen and now exists between Zadok, on the one hand, and Lloyd's of London, on the other hand, concerning the respective rights and duties of the parties under the Policy. On or about April 3, 2020, Zadok requested coverage for COVID-19-related losses through its agent. Lloyd's of London responded with a letter denying coverage and seeking information that is not reasonably necessary to evaluate Zadok's claim. Lloyd's of London is in

22

breach of its obligations by refusing to provide coverage despite having sufficient information to evaluate and pay the claim.

104.    Zadok seeks a declaration of the parties' respective rights and duties under the Policy and requests the Court declare the conduct of Lloyd's of London alleged above to be unlawful and in material breach of the Policy so that future controversies may be avoided. Specially, Zadok seeks a declaration that:

      a.  The losses incurred in connection with COVID-19 and the Closure Orders are insured losses under Zadok's Policy; and

      b.  Lloyd's of London is obligated to pay the full amount of Zadok's Business Income losses incurred and to be incurred in connection with COVID-19 and the Closure Orders during the period of restoration and the necessary suspension of its business operations.

105.    Zadok further seeks an injunction enjoining Lloyd's of London (1) from continuing to engage in breaching its coverage obligations under the Business Income Coverage Extension; and (2) ordering Lloyd's of London to comply with the terms of the Policy regarding its coverage decisions.

**C.    Breach of Contract – Extra Expense**

106.    Zadok incorporates by reference the preceding paragraphs as if fully alleged herein.

107.    Under Texas law, essential elements of a breach of contract claim are: (1) existence of a valid contract; (2) performance or tendered performance by plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Toney v. State Farm Lloyds*, 108 F. Supp. 3d 475, 480 (S.D. Tex. 2014).

108.    Zadok purchased a property coverage policy from Lloyd's of London.

109.     Zadok had substantially performed its obligations under the Policy including by paying all policy premiums due on the Policy and by giving sufficient notice of the claim to Lloyd's of London. Alternatively, Lloyd's of London has waived any conditions, terms or defenses to coverage.

110.     The Policy is an enforceable contract between Lloyd's of London and Zadok. The Policy was in effect as of the date that Zadok's retail jewelry store was required to close due to the Closure Orders.

111.     Zadok has sustained a loss under the Extra Expense coverage in the Policy due to the COVID-19 virus and Closure Orders.

112.     Lloyd's of London breached the terms of that contract by wrongfully denying the claim for Extra Expense coverage. Lloyd's of London wrongfully denied the claim by misrepresenting to Zadok the policy provisions and exclusions pertaining to the loss alleged.

113.     As a direct and approximate result of Lloyd's of London's breach of contract, Zadok has sustained substantial monetary damages in an amount to be determined at trial.

**D.     Declaratory Judgment and Injunctive Relief – Extra Expense**

114.     Zadok incorporates by reference the preceding paragraphs as if fully alleged herein.

115.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

116.     An actual controversy has arisen and now exists between Zadok, on the one hand, and Lloyd's of London, on the other hand, concerning the respective rights and duties of the parties under the Policy. On or about April 3, 2020, Zadok requested coverage for COVID-19-related losses through its agent. Lloyd's of London responded with a letter denying coverage and seeking information that is not reasonably necessary to evaluate Zadok's claim. Lloyd's of London is in

breach of its obligations by refusing to provide coverage despite having sufficient information to evaluate and pay the claim.

117.    Zadok seeks a declaration of the parties' respective rights and duties under the Policy and requests the Court declare the conduct of Lloyd's of London alleged above to be unlawful and in material breach of the Policy so that future controversies may be avoided. Specially, Zadok seeks a declaration that:

    c.  The losses incurred in connection with COVID-19 and the Closure Orders are insured losses under Zadok's Policy; and

    d.  Lloyd's of London is obligated to pay the full amount of Zadok's Extra Expense losses incurred and to be incurred in connection with COVID-19 and the Closure Orders during the period of restoration and the necessary suspension of its business operations.

118.    Zadok further seeks an injunction enjoining Lloyd's of London (1) from continuing to engage in breaching its coverage obligations under the Extra Expense Coverage Extension; and (2) ordering Lloyd's of London to comply with the terms of the Policy regarding its coverage decisions.

**E.    Breach of Contract – Civil Authority**

119.    Zadok incorporates by reference the preceding paragraphs as if fully alleged herein.

120.    Under Texas law, essential elements of a breach of contract claim are: (1) existence of a valid contract; (2) performance or tendered performance by plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Toney v. State Farm Lloyds*, 108 F. Supp. 3d 475, 480 (S.D. Tex. 2014).

121.    Zadok purchased a property coverage policy from Lloyd's of London.

122.     Zadok had substantially performed its obligations under the Policy including by paying all policy premiums due on the Policy and by giving sufficient notice of the claim to Lloyd's of London. Alternatively, Lloyd's of London has waived any conditions, terms or defenses to coverage.

123.     The Policy is an enforceable contract between Lloyd's of London and Zadok. The Policy was in effect as of the date that Zadok's retail jewelry store was required to close due to the Closure Orders.

124.     Zadok has sustained a loss under the Civil Authority coverage in the Policy due to the COVID-19 virus and Closure Orders.

125.     Lloyd's of London breached the terms of that contract by wrongfully denying the claim for Civil Authority coverage. Lloyd's of London wrongfully denied the claim by misrepresenting to Zadok the policy provisions and exclusions pertaining to the loss alleged.

126.     As a direct and approximate result of Lloyd's of London's breach of contract, Zadok has sustained substantial monetary damages in an amount to be determined at trial

**F.     Declaratory Judgment and Injunctive Relief – Civil Authority**

127.     Zadok incorporates by reference the preceding paragraphs as if fully alleged herein.

128.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

129.     An actual controversy has arisen and now exists between Zadok, on the one hand, and Lloyd's of London, on the other hand, concerning the respective rights and duties of the parties under the Policy. On or about April 3, 2020, Zadok requested coverage for COVID-19-related losses through its agent. Lloyd's of London responded with a letter denying coverage and seeking information that is not reasonably necessary to evaluate Zadok's claim. Lloyd's of London is in

breach of its obligations by refusing to provide coverage despite having sufficient information to evaluate and pay the claim.

130.    Zadok seeks a declaration of the parties' respective rights and duties under the Policy and requests the Court declare the conduct of Lloyd's of London alleged above to be unlawful and in material breach of the Policy so that future controversies may be avoided. Specially, Zadok seeks a declaration that:

     e.  The losses incurred in connection with COVID-19 and the Closure Orders are insured losses under Zadok's Policy; and

     f.  Lloyd's of London is obligated to pay the full amount of Zadok's Civil Authority losses incurred and to be incurred in connection with COVID-19 and the Closure Orders during the period of restoration and the necessary suspension of its business operations.

Zadok further seeks an injunction enjoining Lloyd's of London (1) from continuing to engage in breaching its coverage obligations under the Civil Authority Coverage Extension; and (2) ordering Lloyd's of London to comply with the terms of the Policy regarding its coverage decisions

## G.    Violation of Texas Prompt Payment of Claims Statute

131.    Zadok incorporates by reference the preceding paragraphs as if fully alleged herein.

132.    Under Texas law, to prevail under a claim for damages under the Texas Prompt Payment of Claims Act ("TPPCA"), the insured must establish: (1) the insurer's liability under the insurance policy; and (2) that the insurer has failed to comply with one or more sections of the TPPCA in processing or paying the claim. *Barbara Tech. Corp. v. State Farm Lloyds*, 589 S.W.3d 806, 813 (Tex. 2019); *see also Cox Operating, L.L.C. v. St. Paul Surplus Lines Ins. Co.*, 795 F.3d 496, 505 (5th Cir. 2015).

133.    Zadok seeks to establish Lloyd's of London's liability through the breach of contract causes of action enumerated above.

134.    The failure of Lloyd's of London to pay for the losses and/or follow the statutory guidelines for accepting or denying coverage constitutes a violation of the TPPCA, TEX. INS. CODE §§ 542.051, *et seq.*

135.    Zadok is therefore entitled to interest and attorneys' fees as set forth in TEX. INS. CODE § 542.060, in addition to its claim for damages.

**H.    Bad Faith Violation of Texas Insurance Code Provisions**

136.    Zadok incorporates by reference the preceding paragraphs as if fully alleged herein.

137.    Lloyd's of London, as an entity engaged in the business of insurance, is required to comply with Chapter 541 of the Texas Insurance Code.

138.    Lloyd's of London violated several provisions of Chapter 541 of the Texas Insurance Code in its handling of Zadok's claim.

139.    Specifically, Lloyd's of London violated TEX. INS. CODE § 541.051 by making statements misrepresenting the terms and/or benefits of the policy by selling the policy as an all-risk policy with no virus or pandemic exclusions, yet still denying coverage to Zadok for losses due to COVID-19.

140.    Lloyd's of London also violated TEX. INS. CODE § 541.060 by: (1) misrepresenting to Zadok a material fact or policy provision relating to coverage at issue; (2) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability had become reasonably clear; (3) failing to promptly provide to Zadok a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or offer of a compromise settlement of a claim; (4) failing within a

28

reasonable time to affirm or deny coverage of a claim to Zadok or submit a reservation of rights to Zadok; and (5) refusing to pay the claim without conducting a reasonable investigation with respect to the claim.

141.    Further, Lloyd's of London violated TEX. INS. CODE § 541.061 by: (1) making an untrue statement of material fact; (2) failing to state a material fact necessary to make other statements made not misleading considering the circumstances under which the statements were made; (3) making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact; (4) making a material misstatement of law; and (5) failing to disclose a matter required by law to be disclosed.

142.    Lloyd's of London's violations of Chapter 541 of the Texas Insurance Code enumerated above caused damages to Zadok in at least the amount of policy benefits wrongfully withheld.

143.    Lloyd's of London knowingly committed the acts complained of. As such, Zadok is entitled to exemplary and/or treble damages pursuant to TEX. INS. CODE § 541.152(a)-(b).

## VI.    ATTORNEYS' FEES

144.    Zadok engaged the undersigned attorneys to prosecute this lawsuit against Defendant and agreed to pay reasonable attorneys' fees and expenses through trial and any appeal.

145.    Zadok is entitled to reasonable and necessary attorneys' fees pursuant to TEX. CIV. PRAC. & REM. CODE §§ 38.001-003 because it is represented by an attorney, presented the claim to Defendant, and Defendant did not tender the just amount owed before the expiration of the 30th day after the claim was presented.

146.    Zadok further prays that it be awarded all reasonable attorneys' fees incurred in prosecuting its causes of action through trial and any appeal pursuant to TEX. INS. CODE §§ 541.152 and 542.060.

## VII.    PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Zadok requests relief against Defendant Lloyd's of London as follows:

1.    For a judgment against Lloyd's of London for the claims for relief alleged against it;

2.    For a judicial declaration that the policy of insurance extends coverage from direct physical loss and/or from a civil authority shut-down due to a global pandemic virus;

3.    For monetary damages in an amount to be determined at trial;

4.    For punitive damages;

5.    For all prejudgment and post-judgment interest at the maximum rate allowable by law;

6.    For Zadok's reasonable and necessary attorney's fees;

7.    For Zadok's costs incurred; and

8.    For such other and further relief to which Zadok may be justly entitled.

## VIII.  JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Zadok demands a trial by jury of all claims asserted in this complaint so triable.

Respectfully submitted,

**DALY & BLACK, P.C.**

By:   /s/ John Scott Black

John Scott Black
State Bar No. 24012292
Southern District Bar No. 28467
jblack@dalyblack.com
2211 Norfolk, Ste. 800
Houston, TX 77098
713.655.1405—Telephone
713.655.1587—Fax
ecfs@dalyblack.com (service)
**ATTORNEY-IN-CHARGE FOR PLAINTIFF
DZ JEWELRY LLC d/b/a ZADOK JEWELERS**

*Of Counsel*
Richard D. Daly
State Bar No. 00796429
Southern District Bar No. 20706
rdaly@dalyblack.com
Donald C. Green II
State Bar No. 24086619
Southern District Bar No. 2516640
dgreen@dalyblack.com
**ATTORNEYS FOR PLAINTIFF
DZ JEWELRY LLC d/b/a ZADOK JEWELERS**